# WILCOX, Respondent, v. COURT OF HONOR, Appellant.

### St. Louis Court of Appeals, December 29, 1908.

1. **INSURANCE: Fraternal Beneficiary Associations: Suicide: Delirium.** In an action on a benefit certificate issued by a fraternal beneficiary association which provided that a smaller sum than the amount provided in the certificate should be paid in case the insured committed suicide "except it be committed in a delirium resulting from illness," the evidence is examined and held sufficient to support a finding by the jury that the insured committed suicide while in a delirium resulting from illness.

2. ————: ————: ————: **Change of By-Laws.** A benefit certificate in a mutual beneficiary association provided for the payment of the benefit in case of suicide under certain conditions. A subsequent amendment of the by-laws was adopted providing that full payment should not be made in case of suicide under any condition. The insured had agreed in his application to comply with the constitution, laws, rules and regulations of the order in force or that might be in force thereafter. *Held*, the agreement did not affect the liability on his benefit certificate, but could only relate to his duties as a member, to the regulation of the social and lodge features of the order.

Appeal from Monroe Circuit Court.—*Hon. David H. Eby,* Judge.

AFFIRMED.

*William B. Risse, James P. Boyd* and *Tunnell & Hart* for appellant.

(1) We are aware that this court has passed on the question of the effect of after-passed by-laws in the case of Zimmermann v. Supreme Tent K. M. of the World, 122 Mo. App. 591, and Lewine v. Supreme Lodge, 122 Mo. App. 547, but as we view the matter these cases can be clearly distinguished from the case at bar. (2) The Supreme Court of Missouri has recently in the case of Westerman v. The Supreme Lodge

K. of P., 196 Mo. 670, taken a very decided stand against the doctrine of vested interest in benefit certificates issued by fraternal societies either in the insured or the beneficiary. The Supreme Court in that case has cited with approval the decision of this court in the case of Morton v. Royal Tribe of Joseph, 93 Mo. App. 78, and cites that portion of the opinion of the court in the Morton case, l. c. 92, dealing with this proposition as follows: "It is the settled law that neither the member nor the beneficiary has any vested interest in the certificate of insurance prior to the death of the member." Hofman v. Grand Lodge B. L. of F., 73 Mo. App. 47; Grand Lodge A. O. U. W. v. Reneau, 75 Mo. App. 402; Miller v. Grand Lodge O. B. A., 72 Mo. App. 499. (3) Wilcox had acquiesced in the after-passed by-law retaining his membership for three years after the passage of the amended by-law. The amendment to the by-laws was adopted in May, 1903, and from that time to the time of the death of Wilcox in March, 1906, he continued to pay his dues and assessments and continued his benefit certificate in force. The members of a fraternal beneficiary society are conclusively presumed to know the by-laws of the society. Lloyd v. Modern Woodmen, 113 Mo. App. 19; Modern Woodmen v. Tevis, 117 Fed. 369. (4) The court erred in submitting to the jury the issue as to suicide while in delirium. The evidence fails to show any evidence whatever that Wilcox was in delirium at the time of his death; on the contrary, the evidence shows that he was not delirious a short time before the suicide was committed and this condition being once shown is presumed to continue. 3 Elliott on Evidence (1 Ed.), Vol. 3, p. 1197, sec. 2692; State v. Wade, 161 Mo. 441; State v. Lowe, 93 Mo. 547.

*J. H. Whitecotton* for respondent.

The appellant insists that the trial court erred in sustaining respondent's objection to section 145 being read in evidence, being an amendment of the section in

force at the time of the issuance of the certificate, and cite Zimmermann v. Supreme Tent, K. O. T. M., 122 Mo. App. 591, and Lewine v. Supreme Lodge, 122 Mo. App. 547, as being clearly distinguished from the case at bar, but as we view the matter these cases disprove the appellant's contention in this case.  The court in this case also directly and positively disapproves of the views expressed in the case of Morton v. Royal Tribe of Joseph, 95 Mo. App. 78, that are in conflict with the Lewine case, supra.  Smith v. Supreme Lodge, 83 Mo. App. 512; Knight Templars v. Jarmon, 104 Fed. 645.  The cases of Loyd v. Modern Woodmen, 113 Mo. App. 19, and Modern Woodmen v. Tevis, 117 Fed. 369, do not support appellant's contention in any respect and the same is true of case of Morton v. Royal Tribe of Joseph, 93 Mo. App. 93, referred to by appellant.

BLAND, P. J.—Defendant is a fraternal benefit association, incorporated under the laws of the State of Illinois and authorized to do business in the State of Missouri under the laws thereof.  On July 6, 1897, defendant  admitted George W. Wilcox, of Monroe county, Missouri, as a member of the order and issued to him its certificate No. 20547, by which it promised to pay his beneficiary, Paralea Wilcox, his wife, the sum of $1,000, on the death of the insured.  Wilcox paid all his dues and assessments and otherwise complied with the laws of the order until March 21, 1906, on which date he died.  Notice of his death and proofs of loss were duly furnished defendant and payment of the $1,000 insurance demanded.  Defendant tendered plaintiff $400 in full satisfaction of its liability under the certificate.  Plaintiff refused to accept said tender and this action was brought to recover the full amount of the policy.

The petition is in the usual form in such cases. As a special defense it is alleged in the answer, that

George W. Wilcox made application for a certificate of membership and insurance in which application is the following clause: "I agree to make punctual payment of all dues and assessments for which I may become liable, and to conform in all respects to the constitution, laws, rules and usages of this order now in force, or which may hereafter be adopted by the Supreme Court thereof." Further answering, defendant states that the certificate of insurance contains the following agreement:

"This certificate was issued and made a liability upon the order to the persons named within, upon the expressed conditions that the insured shall comply with the constitution, laws, rules and regulations of the order, in force, or that may be in force hereafter, and that the statements made in the application for this certificate are true.

"This order will not pay the benefits of members who commit suicide, whether sane or insane, except it be committed in delirium resulting from illness, or while the member is under treatment for insanity, or has been judicially declared to be insane; but in all cases not within said exceptions, the amount of money contributed to the benefit fund by such members, shall be returned, and shall be paid to the beneficiaries out of said fund in lieu of the benefit; or if said application for membership or medical examination, or any part of them, shall be found in any respect, untrue, then this certificate shall be null and void, and of no effect, and all moneys which shall have been paid, and all rights which have accrued under this certificate shall be absolutely forfeited."

The answer also states that the following by-law was in effect on the date the certificate was issued: "This order will not pay the benefits of members who commit suicide, whether sane or insane, except it be committed in delirium resulting from illness, or while the member is under treatment for insanity, or has been judicially

declared to be insane; but in all cases not within said exceptions, the amount of money contributed to the benefit fund by such members shall be returned and shall be paid to the beneficiaries out of said fund in lieu of the benefit." That on May 28, 1903, this by-law was amended to read as follows: "If a benefit member commits suicide, whether sane or insane, voluntary or involuntary, there shall be payable to the beneficiaries entitled thereto, five per cent of the face of the certificate for each year he shall have been continuously a member of the society, and after twenty years of continuous membership, the certificate shall be payable in full;" and that this by-law (No. 145) was in force on the date of Wilcox's death, and alleged that he committed suicide by shooting himself in the head with a revolver; that at the time he committed suicide he was not in delirium resulting from illness, was not under treatment for insanity, nor had he been judicially declared insane, and stated that under the provisions of the by-laws, as amended, plaintiff was entitled to five per cent of the amount of the insurance for each of the eight years deceased had been a member of the order, or $400, which the answer alleged had been tendered plaintiff. Tender for judgment of this amount was made in the answer.

The reply was as follows: "Come now the plaintiff herein and for her reply to defendant's first amended answer filed herein, admits the organization and incorporation of defendant under and according to the laws of the State of Illinois, but denies each and every other allegation in said answer contained."

1. The trial resulted in a verdict for plaintiff for the full amount of the certificate. Defendant appealed. The death of Wilcox being admitted by the pleadings, defendant offered evidence to substantiate its special defense. This evidence leaves no room to doubt that Wilcox committed suicide by shooting himself in the head with a revolver. He was not under

treatment for insanity at the time, nor had he been judicially declared insane, and the evidence was directed to the question of whether he was delirious as a result of illness, at the moment he shot himself. Wilcox was a justice of the peace and also a real estate and insurance agent, in the city of Madison, Monroe county, Missouri. He had been engaged in the real estate and insurance business for a good many years. The evidence tends to show he had been in bad health for a number of years before he committed suicide and that he frequently acted unnaturally.

R. G. Bassett, a dentist, who had an office in the same building and adjoining that of deceased, testified he had known deceased for twenty years; that deceased would come into his office and stand up and go to sleep; that he had a linoleum on the floor of his office, in blocks and checks, and deceased would kneel down and try to pick them out with a nail or knife; that on the morning of the day he died, deceased said to him that he was feeling very badly that morning, "and ought to be home in bed, sick, could not eat anything, very sick, ought to be in bed and was going home after a while and lie down and rest."

Mrs. Mary Hayden, who had a millinery store in the same building, across the hall from deceased's office, testified as follows: "I just went into his room as I had been in the habit of doing and he was sitting there writing and he got up and asked me to have a chair, and I told him 'No,' and just walked around a moment. He insisted on me taking a chair. I did not —he said that he was sick and had not been home to dinner yet; that was about two o'clock, I suppose, as well as I remember, and he said that he did not eat anything that morning 'except an egg and threw it up.' I did not see Mr. Wilcox again until after he killed himself—suppose about fifteen minutes after I left his office until I saw him dead." Witness also testified that on several days before she had noticed deceased and "he

Wilcox v. Court of Honor.

did not look like he had any health at all and he would say that he did not eat anything;" that she did not notice he was nervous when she called that day; that he complained of being sick, said he had some business to attend to and had not yet been home to dinner; that his wife had 'phoned him but he had some business to attend to before he went home, and said that his wife was anxious about him because he was sick that morning and had called up to know if he was coming home.

On plaintiff's behalf Dr. F. S. Carver testified he had known deceased for about five years, had treated him professionally and that his health was bad during all the time he knew him; that his nervous system was broken down generally and his general health was bad; that he did not seem to be "at himself" all the time but seemed to be delirious at times, would do things when he did not appear to know what he was doing, "would mumble for a few minutes, nobody would understand what he said, at least, I could not; I could not get any sense at all, just mumble to himself." Witness stated that he saw deceased about two hours before his death and talked with him; that he seemed to be "very much excited and very nervous and was shaking like an aspen;" that deceased told him he could use his office, and his mind seemed to be tolerably clear at the time; that "may be one day he would be delirious pretty much all day, maybe two or three days at a time, then for two or three days, apparently, his mind would be in pretty good condition;" that deceased had a bad stomach and his nervous condition was bad and he did not think he would have recovered.

Dr. W. E. Johnson testified that deceased had been in bad health for two or three years prior to his death, and said: "I didn't consider the man hardly of sound mind for quite awhile before his death; I noticed him doing things that I thought would not be done by a man of good mental powers, digging ditches around town, probing the ground and digging up in the street, that

led me to believe him not of sound mind. . . . At times I considered him in better shape than at others; at some times I didn't think the man in shape to transact business for himself. . . . I don't know what was the primary cause; I just supposed from abuse of himself in way of using some narcotic or whiskey, probably had wrecked his health. I saw him about nine or ten o'clock the morning he was found dead; he was very nervous at that time. . . . I don't hardly know to what extent the nervousness be classed, but he then seemed to be restless and traveling from place to place all the time, did not seem to be satisfied anywhere; I was just fixing to go to the country when I last saw him, came down to the livery stable, had a little conversation there with him. . . . I did not think his mind in good shape."

E. C. Brooks testified that he helped deceased in his office and he was not able to write policies of insurance correctly, had heard he used morphine and liquor and had seen him under the influence of liquor.

S. H. Farrell testified that deceased acted peculiar and led him to believe he was not in his right mind; that he came into his (witness') bank on the morning of the day he died and said he wanted a drink of water. "I told him where he could get a drink of water at the back end of the bank, and he went back there and got up along the corner, just picking round among things trying to find a bucket, and no bucket there, and I went and showed him and led him to the bucket of water, and he did not seem to be in his right mind. . . . After I took him back to the bucket of water he went to take a drink of water and said after he got the insurance business written up he was going to straighten up. He then walked up, dropped his pipe as he went out—he was smoking, and went out and left it here on the floor. That was the last time I saw him until he was dead."

Other witnesses testified to the ill health of deceased and to actions indicating an unbalanced mind.

A crumpled piece of paper was found in a pocket of deceased's clothing, on which he had made a pencil memorandum of his life insurance and where the policies would be found; also a memorandum of some commissions due him on insurance. The writing was not dated. On this evidence the court instructed for plaintiff as follows: "The court instructs the jury that unless you find from the evidence in the cause that George W. Wilcox did commit suicide, while not in delirium resulting from illness, your finding should be for plaintiff." For defendant, the court instructed as follows: "The court instructs the jury that if you find from the evidence in the cause, that the death of George W. Wilcox, which is admitted by defendant herein, was caused by a leaden ball or bullet, fired from a revolver purposely discharged by the said Wilcox, with the intent and purpose on the part of him, the said Wilcox, to end his own life, and that at the time of firing the revolver, if so the jury find the said Wilcox was not in delirium resulting from illness, then and in that event, your verdict should be for plaintiff in the sum of four hundred dollars and no more." Defendant insists that the evidence was insufficient to warrant plaintiff's instruction, contending that the evidence of Mrs. Hayden, who saw deceased just a few minutes before he shot himself, and who was the last person to see him alive, shows he was not delirious. Mrs. Hayden saw deceased only for a minute, heard him complain of illness but paid no particular attention to him. She was a non-expert and while her evidence is entitled to weight, it is not so overpowering and convincing as to conclusively overthrow the evidence of the two physicians and the civilian witnesses, whose evidence certainly tends to show that deceased, from excessive use of narcotics and intoxicants, or from some unknown cause, was in a most wretched condi-

tion of health; that he was extremely nervous and that his acts frequently indicated a delirious condition of mind and that he was, generally, mentally unsound. We think this evidence made it incumbent on the court to leave it to the jury to find whether deceased was delirious at the time he committed suicide, and that the instructions given, fairly and fully submitted this issue to the jury. It is further insisted that under the pleadings, this issue was not in the case. The answer pleaded the suicide by-law and alleged, affirmatively, that deceased was not in delirium resulting from illness at the time he committed suicide. The reply put these allegations at issue. Besides, at the trial defendant took upon itself the burden of proving not only that deceased committed suicide but that he was not delirious at the time, hence both by its pleadings and the position it assumed at the trial defendant is estopped to deny that the question as to whether or not deceased was delirious at the time he committed suicide was not in the case.

Defendant offered to read amended by-law No. 145, adopted in May, 1903, and to show that it was re-enacted at a later period but before Wilcox died. On objections of plaintiff the amended by-law was excluded by the court. This action of the court is assigned as error. Wilcox accepted the certificate of insurance containing a stipulation that he "agreed" to comply with the "constitution, laws, rules and regulations of the order in force or that may be in force thereafter," and his application for insurance contained a like provision, hence his beneficiary is bound by the agreement, if it affects the certificate of insurance. This provision does not, in express terms embrace or even refer to the certificate of insurance, nor does it comprehend it by implication. There is nothing in the agreement that can be construed into a stipulation, that the terms of the certificate of insurance might be altered, modified or changed in the least particular. The agreement included only such by-laws, rules and regula-

tions that might thereafter be adopted, as should relate to the member's duties, his personal conduct, occupation and habits of life, to the regulation of the social or lodge features of the order, or manner and time of assessing and collecting assessments, and other laws in respect to the ordinary administration of the business affairs of the order. [Zimmermann v. Supreme Tent, K. O. T. M., 122 Mo. App. 591; Lewine v. Supreme Lodge K. of P., 122 Mo. App. 547.] The suicide by-law in force at the time the certificate was issued, entered into and formed a part of the contract of insurance, and we hold that the amended by-law on the subject of suicide did not in the least alter or change the contract in respect to suicide, and that the amendment was not intended to affect contracts of insurance then in force. Neither was the power reserved to the order, by the application or certificate, or the by-laws, to substitute at any time an amended by-law on the question of suicide which would change in the least the provisions of the contract of insurance. We therefore think the objection to the reading of the amended by-law was properly sustained, and affirm the judgment. All concur.